Verna LOMBARD, Plaintiff,

v.

The SCHOOL DISTRICT OF the CITY OF ERIE, PENNSYLVANIA, Edmond T. Giovannelli, John C. Harkins, Mary M. Lamary, Leonard L. Locastro, Jr., Donald A. Lundeen, Dr. A. E. Narducci, Dr. John N. Petrus, Edward J. Sparaga, Geraldine Zurn, Individually and as members of the Board of Education of the School District of the City of Erie and Richard Hilinski, Individually and as superintendent of the School District of the City of Erie, Defendants.

Donna RUTHERFORD, Plaintiff,

v.

The SCHOOL DISTRICT OF the CITY OF ERIE, PENNSYLVANIA, Edmond T. Giovannelli, John C. Harkins, Mary M. Lamary, Leonard L. Locastro, Jr., Donald A. Lundeen, Dr. A. E. Narducci, Dr. John N. Petrus, Edward J. Sparaga, Geraldine Zurn, Individually and as members of the Board of Education of the School District of the City of Erie and Richard Hilinski, Individually and as superintendent of the School District of the City of Erie, Defendants.

Civ. A. Nos. 76–172 Erie, 76–173 Erie.

United States District Court,
W. D. Pennsylvania.

Dec. 20, 1978.

Jay Brian Schiegg, Erie, Pa., for plaintiffs.

Bradley H. Foulk, Erie, Pa., for defendants.

## OPINION

WEBER, Chief Judge.

The Plaintiffs in these related cases are female teachers who brought suit against the School District of the City of Erie, members of the Board of Education of Erie, and Richard Hilinski, superintendent of the Erie School District on grounds of sex discrimination. Their claims are based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 which prohibits discrimination in hiring and promotional practices on the basis of sex and under 42 U.S.C. § 2000e–3 which prohibits retaliation against employees who have charged that their employers have discriminated against them on the basis of sex.

The School District has employed Plaintiff Donna Rutherford as a school teacher since 1968. Rutherford was certified to serve as an elementary school principal in June 1975 and as a secondary school principal in February 1975. Since her certification as a secondary school principal, Rutherford has sought to deepen her experience and to improve her credentials for a permanent principalship by serving as a substitute principal. Shortly after she was certified as a secondary school principal, Rutherford served as a substitute principal at Wilson Jr. High School from March 10 to June 31, 1975. In August 1975, Rutherford unsuc-

cessfully applied for a permanent position as a secondary school principal. The three available positions were given to three males,[1] each of whom had been certified as a principal for a period of time longer than that of Rutherford.[2]

Rutherford contends that those eventually appointed received longer interviews than she did. Andrew Paykos, Assistant Supervisor of Schools, explained that Rutherford's interview was shorter because her qualifications and interest were already known. Rutherford testified that Richard Hilinski, the Superintendent of Schools, told her that she was not appointed because the "School Board would never approve a woman"; Hilinski testified, however, that he never made such a statement because he was well aware of the legal consequences, having faced considerable teachers' grievance litigation in the past.

The interviewing team submits reports of its meeting with candidates to the Superintendent of Schools, who then recommends one of the candidates to the School Board which makes the final decision to hire or not to hire. The Superintendent's recommendation is given great weight. Mr. Hilinski testified that his recommendations to the Board were based upon the following factors, not necessarily set out in their order of importance: interview results; seniority within the District, his own subjective or professional evaluation of the candidates, oral or written evaluations of the candidate, and on the candidate's performances in other administrative positions. Hilinski testified that the three candidates who had received principalships in August 1975 had compiled in his view commendable records of substantial experience as school administrators and that it was his professional evaluation of these men, and not sex bias against Plaintiff Rutherford, which led to their appointment. Hilinski acknowledged that Rutherford was one of several competent, qualified candidates for the position.

After learning that she would not receive one of the August 1975 appointments, Rutherford filed a charge with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission. Alleging retaliation, Rutherford contends that the Board did not select her to substitute as a second school principal during the 1975–1976 academic year. Rutherford served as a substitute principal for one semester during the 1976–1977 academic year and for 36 days during the 1977–1978 academic year.

In August 1976 Rutherford applied for one of two open positions as a reading specialist. Rutherford contends these positions were eventually given to two other women out of retaliation against her for filing a sex discrimination action against the School District. Rutherford testified, however, that she was told that she was not appointed because it was anticipated that she would receive an administrative assignment in the near future. During the 1976–1977 school year, Rutherford was appointed to serve as Assistant Principal at Strong Vincent High School for the entire spring semester.

Plaintiff Verna Lombard is a fifth grade teacher with about 20 years teaching experience. Lombard was certified as an elementary school principal in September 1973. In June 1975, Lombard served as an acting

---

1. Rutherford contends that one of the appointees was appointed principal at Memorial High School without having formally applied for the job. While this may indicate the lack of a highly detailed and rigorously observed hiring procedure, we do not believe, and hence we disagree with the Plaintiffs, that it necessarily reflects sex discrimination.

2. In August 1975 the Erie School District employed thirteen people who were certified as secondary principals and interested in permanent positions as secondary school principals. Of these thirteen, Rutherford was the only female. The small statistical population (13) and the small percentage of females (1,—7.6%) in the population precluded Rutherford from demonstrating a statistical imbalance suggesting sex bias. No contention is made that the certifying procedure is biased. We note that, of the four present secondary school principals, one is a female and that at two of the secondary schools, females serve as assistant principals.

principal at Jones Elementary School for less than one week, but was interested in serving permanently as principal. The permanent assignment went to a male whose qualifications and teaching experience, she contends, were less than hers. Lombard indicated in her Complaint that she was told that her replacement "had applied pressure and wanted more money," Complaint, ¶ 4(c).

Lombard filed charges of sex discrimination. In the 1975–1976 school year, she was asked to substitute for 25 days as an acting principal. She substituted as acting principal for 31 days in 1974–1975, and for several months in 1976–1977.

Plaintiff Rutherford contends that the Defendants' actions give rise to three counts of sex discrimination:

1) sex discrimination in regard to the August 1975 appointments:

2) retaliation for her charges of sex discrimination by reducing her time as substitute principal in 1975–1976; and

3) the appointment of others to the reading specialist positions in August 1976.

Plaintiff Lombard contends that the Defendants' actions give rise to two counts of discrimination:

1) sex discrimination in the denial of a permanent appointment at Jones School in August 1975; and

2) retaliation for her charges of sex discrimination by reducing her time as substitute principal in 1975–1976.

Before examining each of these allegations in light of the evidence adduced at trial, the Court believes that a brief discussion of the rapidly changing law in this area would help to clarify the real issues at stake in this litigation. The law provides a special analytical framework for evaluating a plaintiff's claim of racial or sex discrimination. First, the plaintiff must meet the jurisdictional prerequisites under Title VII by filing charges with the EEOC and by receiving the Commission's statutory notice of the right to sue. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Second, the plaintiff must demonstrate a prima facie case of the *fact* of discrimination which does not necessarily entail proof of *intent* to discriminate or any animus toward members of a particular race or gender. This showing is commonly made by a statistical presentation showing a disproportionate racial or sex imbalance, see e. g., *United States v. Intern. Assn. of Elevator Constructors*, 538 F.2d 1012, 1015 (3d Cir. 1976), but may also be made by showing that according to some objective criteria, like length of experience, the plaintiff is clearly more qualified than others, see, e. g., *United States v. Wattsburg Area School District*, 429 F.Supp. 1370 (W.D.Pa.1977), or with testimony or documentary evidence probative of discrimination, see, e. g., *Ostapowicz v. Johnson*, 541 F.2d 394 (3d Cir. 1976) [foreman said he would "take every girl machine operator . . . off and replace with men" if a woman was promoted to a certain job]; *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 258 (3d Cir. 1975) [Defendant's recruitment brochure describes position of claims representative as "Fit for a Queen" while others challenge the applicant with the inquiry "Are you the right man?" for the job.]

After the plaintiff presents evidence of the fact of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the apparently unequal treatment, *McDonnell Douglas Corp. v. Green*, 411 U.S. at 801, 93 S.Ct. at 1824. In meeting their burden of proof, however, the defendant need not "prove [the] absence of [any] discriminatory motive,"[3] *Trustees of Keene State College v. Sweeney*, —— U.S. ——, ——, 99 S.Ct. 295, 58 L.Ed.2d 216, 219 (1978). We stress that, to avoid Title VII liability, the defendant need only articulate a reason for the apparently unequal treat-

---

3. The Court notes that any attempt to offer absolute proof of such a negative clashes with fundamental precepts of logic.

ment that is not sex related, and need not state that the selection was based upon merit. Stating that a man was selected over a woman for a job because the man had more friends in high places constitutes a "non-discriminatory reason" for the unequal treatment sufficient to avoid liability under Title VII even though such hiring practices may violate other laws.

■ The defendants must prove the legitimacy of their articulated reason by a preponderance of the evidence, *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 772, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). After the defendant sets forth such reasons, the plaintiff may offer "competent evidence" to show that the articulated reasons are not legitimate and are offered to only mask or serve as a pretext for a discriminatory decision, *McDonnell Douglas Corp. v. Green*, 411 U.S. at 804–05, 93 S.Ct. 1817.

Rutherford's first claim is that the Defendants' decision to appoint three males to secondary school principalships in August 1975 was based upon sex discrimination. Before the trial began, Rutherford's counsel—with the cooperation of the Defendants—went to elaborate efforts to assemble a statistical presentation showing sex discrimination in the 1975 appointments. These efforts were unsuccessful because of the 13 individuals who were certified as secondary school principals and who had indicated an interest in a permanent principalship at a secondary school, 12 were male. Accordingly, the appointment of three males to the available positions was not statistically inconsistent with the preponderance of males in the applicable pool. The Court at trial held that Rutherford's testimony that Hilinski told her that she would not be appointed because the Board "would never approve a woman" constituted a prima facie case of discrimination, and shifted the burden to the Defendants on the basis of that testimony.

■ Hilinski testified during the Defendants' case in chief that the selection of the three men was based upon his perception of their leadership qualities, ability to work with students and other administrators, their understanding of the responsibilities of a secondary school principal, overall personality, experience, and the length of time each candidate had been certified as a secondary school principal. Hilinski said this last criterion was an important differentiating characteristic between the appointees and Rutherford; all the appointees, besides being male, were certified as secondary school principals long before Rutherford, who at the time of the August 1975 appointments had been certified for only six months. In contrast, two of the appointees, Rupert Stadtmiller and Michael Evanoff, had each been certified for over five years, and the third, Henry Chalupzynski, had been certified for over nine years. On cross-examination Rutherford admitted that Evanoff was at least as qualified as she was because he had more experience than she did. The evidence clearly indicates that the August 1975 appointments were not sex based, that is, the male appointees were not selected because they are male and Rutherford was not denied one of the appointments because she is female.

■ After the Defendants explained their reasons for the August 1975 appointments as well as during the presentation of Rutherford's prima facie case, her counsel requested the Court to hear evidence that Rutherford was as qualified as the men who received the August 1975 appointments. Specifically, Plaintiff's counsel sought to admit the Plaintiff's academic records from undergraduate and graduate school and the results of evaluations which the Plaintiff and other candidates received while serving as substitute principals. The Court refused to hear this evidence because it is unable to compare the academic records and subjective evaluations of a disparate group of candidates meaningfully. Through an *in camera* inspection, the Court learned that Rutherford had compiled a commendable academic record in earning a bachelor's degree and masters degrees in public school administration and education. The Court, however, is simply unable to compare the academic records of a group of candidates of different ages, from different colleges, at

considerably different time periods, and under widely different circumstances. The Court cannot conclude that a plaintiff who earned high grades at one college a few years ago is more qualified to be a secondary school principal than another applicant who earned lower grades at a different college some 15 years earlier. Presuming that academic performance is some indication of qualification to serve as a secondary school principal,[4] the Court does not believe that it could give weight to such comparative performances without also listening to explanations of the impact on grades of factors like part-time jobs and the relative difficulty of courses. The Court would have to discount the grades of more recent graduates due to the documented phenomenon of grade inflation. Because such comparisons are difficult, if not impossible, to make and have little probative value for individuals who are not members of the same academic generation, the Court did not admit evidence of Rutherford's academic background.

▮ The Court also could not admit evidence of the evaluations of Rutherford and other individuals who were certified as principals and interested in permanent positions. Placing aside considerations of the right of privacy of those evaluated individuals who are not parties to the litigation, the Court is unable to compare responsibly the subjective evaluations of different candidates by different evaluators. The Court, for example, cannot conclude that a candidate who received an evaluation of "excellent" in several areas like control of classroom and ability to lead classroom discussion is more qualified than a candidate who received an evaluation of "very good" from a different evaluator at another school, before a class of different size at a different time. Quite clearly, such comparisons are beyond the ability of this Court to draw and offer generally inadequate bases for finding sex discrimination. Other less subjective criteria, like length of service as a teacher,

the date of certification or the amount of substitute principalship experience, are more readily calculated and provide far better circumstantial evidence of discrimination than those criteria advanced in this case. Unfortunately, for the plaintiffs, the few items of objective criteria available to the Court in the instant case favor a finding that the August 1976 appointments were not sex based.

Other courts have encountered similar difficulties with requests by plaintiffs that they compare subjective criteria of several applicants for appointments in education to detect sex discrimination. In *Faro v. New York University*, 502 F.2d 1229 (2d Cir. 1974), the court envisaged that the judicial inquiry into the subjective details of the hiring decisions of school administrators would

". . . require a faculty committee charged with recommending or withholding advancements or tenure appointments to subject itself to a court inquiry at the behest of unsuccessful and disgruntled candidates as to why the unsuccessful was not as well qualified as the successful. This decision would then be passed on by a Court of Appeals or even the Supreme Court. The process might be simplified by a legislative enactment that no faculty appointment or advancement could be made without the committee obtaining a declaratory judgment naming the successful candidate after notice to all contending candidates to present their credentials for court inspection and decision. This would give 'due process' to all contenders, regardless of sex, to advance their 'I'm just as good as you are' arguments. But such a procedure would require a discriminating analysis of the qualifications of each candidate for hiring or advancement, taking into consideration his or her educational experience, the specifications of the particular position open and, of great importance, the personality of the candidate." 502 F.2d at 1232.

---

4. The Court cannot concede that important qualities like common sense, leadership, discipline and maturity are learned only in academe and that a successful student has necessarily acquired these qualities in greater quantities than a less successful student.

Rutherford's second and third allegations are that the Defendants retaliated to her charge of sex discrimination by not appointing her to serve as a substitute principal in the 1975–1976 academic year and by not appointing her to the position of reading specialist in August 1976. The preponderance of the evidence indicates otherwise. Andrew Paykos, the Assistant Superintendent of Schools, testified that during the 1975–1976 school year the School District was in a "budget crunch" and that the District tried to save money by using as substitutes administrators who were already being paid the increased salary which acting principals received instead of appointing individuals like Rutherford who received additional pay for serving as a substitute. Paykos denied that Rutherford was not appointed as a substitute out of any retaliatory motive, and his testimony is corroborated by the fact that Rutherford was appointed to substitute as principal for the entire semester during the 1976–1977 school year and for 36 days during the 1977–1978 school year. In addition, Rutherford herself admitted that she was told she did not receive a reading specialist position in August 1976 because she had informed school officials of her interest in a principalship and because school officials anticipated that Rutherford was "in line" for a principalship or an assistant principalship and would receive such a position in the near future. In fact, Rutherford was appointed to serve as an assistant principal for an entire semester during the next academic year. This testimony, plus the extensive substitution experience that Rutherford received from 1976 through 1978, convinces us that the Defendants did not retaliate against Rutherford for filing a sex discrimination charge by not appointing her as a substitute principal in 1975–1976 and by appointing other women to reading specialist positions in August 1976.

Lombard's first allegation is that the appointment of Dr. John Feldmeier as permanent principal of Jones Elementary School in August 1975 was based upon sex discrimination. Lombard had been appointed acting principal of Jones School one week before the start of the 1975–1976 school year with the instruction to prepare the school for opening. After Lombard had served less than a week as acting principal, Dr. John Feldmeier was appointed permanent principal. Defendant Hilinski testified that Feldmeier was selected because he was an available, experienced, and able administrator who was already being paid at the salary level received by elementary school principals. According to Hilinski, the financial condition of the school district at the time made it expedient to appoint individuals who were already receiving a principal's salary instead of those individuals, like Plaintiff Lombard, whose appointment would require the district to use additional funds to increase their salary to that of a principal. Furthermore, John Feldmeier had earned a Ph.D. degree and Lombard had not; the award of a Ph.D. degree is a recognized, objective benchmark of advanced academic achievement and is among those objective factors that the Court is able to use to evaluate hiring decisions for evidence of sex discrimination.[5]

Second, Lombard contends that the Defendants retaliated against the charge of sex-discrimination which she filed in August 1975 by not appointing her as a substitute principal from September 1975 to March 1976 and by only appointing her for 25 days during the entire academic year. Lombard was selected to substitute for substantial periods in subsequent years, including one period of an entire semester at Penn School in 1976–1977 academic year. Ms. Lombard admitted that she was unaware of an alphabetical selection system which may have resulted in a period of time

5. In her Complaint, Lombard virtually admits that Feldmeier's appointment was not sex based when she contends that Feldmeier was appointed principal at Jones School because "he applied pressure and wanted more money." Although other evidence indicated that Feldmeier's appointment did not involve a pay raise, an appointment resulting from the application of "pressure" or, for example, a threat that the applicant would resign if not appointed is clearly not sex based and hence is not actionable under Title VII. Accordingly, Lombard's own pleadings articulate a non-discriminatory reason for the Jones School appointment.

574

during which she was not asked to substitute. In sum, the Defendants were able to articulate legitimate, non-discriminatory reasons for the hiring of Dr. Feldmeier and for the pattern of appointments to substitution positions which Plaintiff Lombard received after filing a claim of sex discrimination against the Defendants. Furthermore, we note that the evidence of retaliation which Lombard produced, when viewed in a light favorable to her, was barely sufficient to establish a prima facie case.

During the course of the trial the Court heard testimony about other appointments which the Plaintiffs claim were made for discriminatory or retaliatory reasons.[6] These instances were not specifically addressed in the pretrial narratives. Nevertheless, we have considered them and find that there is generally less evidence of discrimination or retaliation with respect to these instances than there was with respect to those claims of discrimination or retaliation which we have discussed above.

---

**6.** In particular, Rutherford contends that, out of retaliation for her sex discrimination charge, the School Board appointed another to be principal at Wayne School in 1977. Hilinski testified that he recommended Ray Fiorelli and Joseph Gdaniec to the School Board for appointment and that he considered these individuals to be the most eminently qualified applicants for the job. He testified that he rated both men as outstanding in such qualities as leadership, ability to work with students, personality, flexibility, background, experience and comprehension of student needs. As he explained their credentials, Hilinski was clearly able to articulate a non-discriminatory reason for their appointment.